UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CIGAR MASTERS PROVIDENCE, INC.,   :
      Plaintiff,   :
         :
      v.   :             C.A. No. 16-471S
         :
OMNI RHODE ISLAND, LLC,   :
      Defendant.

## REPORT AND RECOMMENDATION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

In this dispute over the Lease between a landlord, Defendant Omni Rhode Island, Inc., and its tenant, Plaintiff Cigar Masters Providence, Inc., Omni has filed a motion (ECF No. 23) asking the Court to preliminarily enjoin Cigar Masters from permitting the smoking of any tobacco products on the leased premises. Omni grounds its motion in the likelihood that it will succeed on the merits of its claims that the tobacco smoke and related odors escaping from Cigar Masters' business constitute a trespass and a private and public nuisance, as well as that Cigar Masters has breached its Lease-based promise to "install and maintain throughout the Term a ventilation system designed to remove, to the extent technologically feasible, smoke and related odors from the interior of the Premises and from any exhaust to the outside of the Premises and into any Common Areas." In arguing that the equities favor interim relief, Omni asks the Court to focus not only on the significant adverse impact on its other tenants (a restaurant known as "Fleming's" and luxury condominiums known as the "Residences") and on its own guests, staff and reputation, but also on the harm to members of the general public, who are unwittingly exposed to the air laced with secondhand smoke emitted by Cigar Masters.

Cigar Masters counters that the injunction Omni seeks is a death-knell to its business, which is the operation of a smoking bar specializing in providing a comfortable space for

customers who wish to smoke tobacco products. Pointing out that both Rhode Island law and the express language of the Lease permit it to operate a smoking bar, Cigar Masters also contends that the escape of tobacco smoke and odors from its premises is beyond its control because the out-migration of smoke-laden air is caused by air pressure imbalances and gaps and openings in building spaces controlled by Omni and its other tenants, yet Omni has failed to do anything to correct these causes. Accordingly, it contends, the equities lean unambiguously toward denial of Omni's motion for preliminary injunction.

The motion was referred to me for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). After the motion was initially filed on January 19, 2017, the parties agreed to a discovery schedule to explore the issues raised by the motion. When discovery and briefing was completed, the Court held an evidentiary hearing on April 24, 2017. Post-hearing briefing closed on May 24, 2017. Consistent with the proposed findings of fact and conclusions of law that follow, I recommend that the Court enter a preliminary injunction that is more limited than the draconian order sought by Omni. Instead of a death-knell order, my proposed findings support the conclusion that, until this case is resolved, Cigar Masters should be ordered to strictly comply with its basic obligations as set out in the Lease and in the applicable Rhode Island statute and regulation. If it declines to do so or fails to comply, in that event, I recommend that all smoking on its premises be banned.

## I.      PROPOSED FINDINGS OF FACT[1]

### A.      The Hearing

These proposed findings of fact are based on the pleadings, evidence and testimony received during the evidentiary hearing, which is briefly summarized here. Omni called four

---

[1] Citations to the hearing transcript are designated as "Tr. ___." Citations to the hearing exhibits are designated as "Ex. ___." Otherwise, citations to the record are designated by reference to the ECF docket number.

witnesses: Allen Potter, who was employed by Omni's predecessor, PRI XVIII, L.P. (referred to as "the Procaccianti Group"), and dealt with Cigar Masters on its behalf from November 2008 until the end of 2012, after which he continued to deal with Omni about Cigar Masters in his capacity as director of operations on behalf of the Residences; Ronan Sweeney, Omni's director of finance, who dealt with Cigar Masters from April 2014 to the present; Michael Shurtleff, who testified by deposition (Ex. D2) as a Fed. R. Civ. P. 30(b)(6) witness on behalf of Phalanx Engineering ("Phalanx"), the entity that installed Cigar Masters' ventilation system and maintained it until May 2016; and Richard Ecord, an industrial hygienist, who was qualified and testified as an expert regarding the conclusions he reached based on testing for nicotine and nicotine markers, as well as regarding the general health effects of the particulates found during testing. Cigar Masters called one witness, Jack Dakermanji, who has been employed by Cigar Masters since 2011, has worked at its Providence location since 2014 and became the general manager at the Providence location in May 2016. All of these witnesses presented credible testimony that was relevant to the issues and helpful to the Court.

B.    The Parties

Cigar Masters is a Rhode Island corporation with its principal place of business in Providence, Rhode Island. Counterclaim, ECF No. 7 ¶ 2. Since at least 2006, Cigar Masters has operated a "cigar bar" in Providence, Rhode Island; the sale and on-premises use of tobacco products, and particularly cigars, is integral to its business. Tr. 186. To operate legally in Rhode Island, Cigar Masters' retail establishment is registered with the Rhode Island Division of Taxation pursuant to R.I. Gen. Laws § 23-20.10-2(15)(a), which permits the operation of "an establishment whose business is primarily devoted to the serving of tobacco products for

consumption on the premises," provided that revenues generated by tobacco products must be greater than 50% of the total for the establishment.

Omni is a limited liability company organized and existing under the law of Delaware, with its principal place of business in Dallas, Texas. Counterclaim, ECF No. 7 ¶ 1. In late 2012, Omni acquired from the Procaccianti Group certain real estate located at 1 West Exchange Street, Providence, Rhode Island, including a building that houses a hotel (hereinafter the "Hotel"). Tr. 75-77; Exs. A-B. In the east tower of the building, there are various retail tenants, including a fine-dining steak restaurant called "Fleming's," a parking garage, Hotel rooms, hallways and common areas, and over a hundred luxury condominium units on the upper floors operating as "the Residences." Tr. 14-16, 75-76. During the period prior to the sale to Omni, the Procaccianti Group owned and operated both the Hotel (under a different name) and the Residences. Tr. 15-16. After Omni assumed ownership, the Residences became an independent entity occupying the east tower of Omni's building. Tr. 14-16.

Other than in the premises occupied by Cigar Masters, smoking is not permitted in the public areas of the premises occupied by Omni and its tenants, including Fleming's, the guest rooms and common areas of the Hotel and the common areas of the Residences. Tr. 15, 76; Ex. 5A. The Residences includes a no-smoking rule in its condominium documents and considers its status as a non-smoking facility to be an important selling point when marketing its condominium units. Tr. 15. The Omni prides itself on operating non-smoking hotels throughout the United States – it features its smoke-free atmosphere in its advertising to attract guests to its properties throughout the nation, including the Hotel. Tr. 76.

C.    The Lease

On December 28, 2006, the Procaccianti Group entered into a predecessor lease with Cigar Masters, which contemplated that Cigar Masters would occupy a retail location within the Hotel.  Ex. A at 1.  On August 21, 2007, the Procaccianti Group and Cigar Masters entered into the Lease that is in issue in this case (Ex. A), granting Cigar Masters the exclusive right to occupy retail space located on the first floor of the east tower for the purpose of operating a "cigar café," selling alcoholic beverages, light food and tobacco products, as well as permitting both on-site consumption of food and beverages and the use of tobacco products by retail customers.  Ex. A §§ 6.1, 18.4.  In addition, at some time between October 2007 and June 2009[2] (the exact date is not in the record), the Procaccianti Group rented space adjacent to the space occupied by Cigar Masters to Fleming's.  See Counterclaim, ECF No. 7 ¶ 5; Ex. 6.

The Lease provided Cigar Masters with an initial five-year term and options to extend for additional terms.  Ex. A §§ 1(f), 2.4.  After Omni acquired the real estate and became the owner and operator of the Hotel, it executed an amendment to the Lease with Cigar Masters dated August 20, 2013; the amendment transferred the rights and obligations of landlord from the Procaccianti Group to Omni, adjusted the rent, and extended the term of the Lease to February 28, 2018, with Cigar Master retaining the option to extend for two successive five-year terms.  Ex. B § 1.  Otherwise, the original Lease terms were ratified.  Ex. B § 10.

The provisions of the Lease on which the parties' dispute is principally focused are found in Article 18.  Ex. A at 14-15.  Most critical to the matter in issue is § 18.3, which addresses "Odor Control."  This section imposes on Cigar Masters the absolute duty to:

---

[2] The first complaint from Fleming's to the Procaccianti Group about cigar smoke "filling and lingering in its private dining rooms" is dated June 25, 2009.  Ex. 5A.  It is clear from this letter that Fleming's had been operating for some time as of that date.  Bracketing the timing of Fleming's commencement of operations is an air pressure analysis procured by Fleming's in October 2007, which apparently was completed before the restaurant opened. Exs. 6, 7.

> [I]nstall and maintain a ventilation system designed to remove, to the extent technologically feasible, smoke and related odors from the Premises and from any exhaust to the outside of the Premises and into any Common Areas.

Ex. A § 18.3. Also in § 18.3, Cigar Masters acknowledges that tobacco smoking is strictly regulated by the State of Rhode Island and is objectionable to the public, and that, "as such [Cigar Masters] has a duty to eliminate the odor and smoke from its premises and from any Common Areas." Id. In addition, § 18.3 saddles Cigar Masters with the duty to respond "promptly and without delay" to any complaints by making "whatever improvements that may be needed, . . . to minimize if not eliminate such smoke and odors." Id. The latter obligation – to make "improvements" – is subject to Omni's right to approve any improvements before they are made. In § 18.4, Cigar Masters agrees to abide by Rhode Island's rules and regulations, particularly with respect to the use of tobacco products; this obligation echoes a related provision in § 6.2 of the Lease, which also dictates that Cigar Masters must comply with all applicable laws and regulations. Finally, in a provision whose meaning is disputed, Cigar Masters' affirmative duty to address the smoke and odor generated by its operations is mirrored in Omni's duty to prevent "objectionable odors" generated in other areas of the Hotel, Fleming's or the Residences (such as the parking garage) from emanating or being dispelled beyond the premises where they are generated. Ex. A § 18.2(b). Read holistically, a central purposes of the Lease is to ensure that tobacco smoke and odor generated by Cigar Masters' operation does not interfere with the landlord's Hotel or with its other tenants.

Other Lease language that is important to the matter in issue appears in § 19.7. That provision states that waiver or indulgence by the landlord (either the Procaccianti Group or Omni) of a Cigar Masters default neither alters the terms of the Lease nor operates as a waiver of a subsequent default. Ex. A § 19.7. This section makes clear that no custom or practice of the

parties that is at variance with the Lease obligations can constitute a waiver of the landlord's right to demand exact compliance.  Id.  Also pertinent is § 6.2, which provides that Cigar Masters shall not operate its business "in any manner to create a nuisance or trespass."

### D.    Physical Attributes of the Space

The physical configuration of the space in and adjacent to the east tower affects the dispute so I pause briefly to describe it.

Pursuant to the Lease, Cigar Masters occupies the corner of West Exchange and Francis Streets, on the ground floor.  Ex. A.  Embedded in the wall facing West Exchange Street that borders the public sidewalk, and approximately twelve feet from the ground, is the vent exhausting air from Cigar Masters to the outside.  Tr. 23-24.  Immediately adjacent to Cigar Masters' exhaust panel is the entrance to the parking garage for the Residences.  Tr. 23.  This parking garage has a large door that opens and closes constantly throughout the day and night. Tr. 19.  Just above the Cigar Masters exhaust panel is a much larger panel of louvers that allow outside air to be sucked into the parking garage when powerful fans on the opposite wall are activated by rising carbon monoxide levels.  Tr. 19.  Around the corner in both directions from Cigar Masters and its exhaust panel are the front and back entrances to the Residences and to Fleming's.[3]  Tr. 26.

The contiguity of the interior space on the first floor of the east tower is similarly pertinent.  Specifically, on the other side of the interior walls enclosing Cigar Masters' premises are the common areas of the east tower, including halls and access to elevators that serve the floors above, where there are both Hotel rooms and over a hundred condominium units.  Tr. 14-

---

[3] These physical relationships are depicted in photographs offered without objection by Omni and received as Exhibits A2 to C2.

15; Ex. A at 22; Ex. 2 at 8.  Fleming's, including its dining room, also shares interior walls with Cigar Masters.  Tr. 56; <u>see</u> Exs. 6, 7.

> **E.**   **Cigar Masters' Duty to Install and Maintain a Ventilation System and its Implementation of the Duty**

After signing the Lease in August 2007, Cigar Masters engaged Phalanx, an engineering firm, to install the required ventilation system.  Ex. D2 at 5.  According to the Phalanx representative, this ventilation system was "well and above" an ordinary system in that it included air exchangers that could change the air six or seven times an hour, bring in air from the outside and exhaust the air to the outside through the exhaust panel, with a bank of prefilters and carbon charcoal filters to filter smoke and odors out of the air circulating inside Cigar Masters' premises.  Ex. D2 at 5-7.  The entire system was designed to operate at slightly negative pressure relative to adjacent spaces so that the Cigar Masters' air would not be pulled into other spaces in the building; if anything, the slightly negative pressure was intended to pull in air from other areas, rather than to allow air to escape from Cigar Masters' premises, other than through the exhaust panel to the outside.  Ex. D2 at 6-7.  There is no evidence suggesting that this ventilation system did not conform to what Cigar Masters was obliged by § 18.3 to install.

Phalanx also was engaged in connection with Cigar Masters' ongoing duty ("throughout [the Lease] Term") pursuant to § 18.3 to "maintain" the ventilation system.  Ex. D2 at 9.  This involved periodically changing the prefilters and, less frequently, the charcoal filters, as well as performing other preventive maintenance.  Ex. D2 at 9.  Regular changing of the filters is critical to the operation of the ventilation system because "dirty filters" prevent air exchange.  Ex. D2 at 10.  Phalanx recommended that the prefilters be changed every eight to ten weeks and the charcoal filters every four months.  Ex. D2 at 9-11.  However, the amount of smoke generated by Cigar Masters led to consensus that the Lease-based duty to maintain the ventilation system

required more frequent changes.  <u>See</u> Tr. 68.  Specifically, in an email dated January 13, 2011, Cigar Masters confirmed what it understood to be its contractual duty: "[w]e should be doing them minimally monthly and charcoals every 6 weeks."  Ex. Z.  Mr. Potter agreed: "we did over time shorten down, down, down to where we determined that if a range of 30 days if the filters were changed with that frequency that it created a [not] perfect but tolerable solution for us." Tr. 29.  This schedule is also reflected by Omni's demand of February 18, 2014: "we request that you change the filters on a monthly basis."  Ex. D.

Despite Lease language unambiguously imposing on Cigar Masters the duty to change its filters at regular intervals, Cigar Masters declined to sign the agreement proffered by Phalanx to set up a protocol for automatic filter changes.  Ex. D2 at 9-10.  Rather, Cigar Masters told Phalanx that it would call when it wanted the filters changed.  Ex. D2 at 11-12.  After the system was installed, Cigar Masters delayed three months before the first maintenance call.  When it was called in, Phalanx found the filters "already dirty, needed to be changed"; Phalanx concluded that it was the dirty filters that were "causing the problem" with air quality.  Ex. D2 at 9-10.  As years passed, Phalanx was called in for filter changes less and less frequently, eventually so infrequently that Phalanx assumed (wrongly) that Cigar Masters must be using someone else to do the work.  Ex. D2 at 13.  And when Phalanx was called in, typically because Cigar Masters had received complaints, it found that "changing the filter typically solve the issues . . . most of the time . . . [b]ecause if the prefilters get plugged, then we're not changing the amount of air that we need to be and if you can't exchange the right amount of air, you get smoke buildup in the space."  Ex. D2 at 14.

The decline in Cigar Masters' calls to Phalanx for filter changes is reflected in the Phalanx invoices.  Ex. D2 (Ex. 1).  They establish that, after the problem in 2008 (when the

filters were changed only twice), the filters were changed eight times in 2009, the first full year. Id. Except for one complaint by Fleming's (Ex. 5A), there is no evidence that the 2009 rate of change was inconsistent with Phalanx's recommendation. Nor is there any other evidence that, during 2009, Cigar Masters was failing to comply with its § 18.3 duty to maintain the ventilation system. Id.; see Tr. 48 (according to Mr. Potter, Cigar Masters was regularly changing their filters "initially"). However, after 2009, the rate declined precipitously – in 2010, it was done only four times, in 2011, five times, and, in 2012, four times. Id. After the end of 2012 when ownership shifted from the Procaccianti Group to Omni, the rate declined further: in 2013 and 2014, the filter changes occurred only three times each year. Id.; Ex. E. By 2015, it was done only twice. Id.; Ex. F. In 2016, it was done once before Omni sent the default notice on March 22, 2016. Ex. G. After the default notice, it was done three more times. Ex. G. And once the parties' dispute boiled over into court, Cigar Masters simply stopped completely, utterly abandoning its duty to comply with its § 18.3 obligation to maintain the ventilation system for almost a year until Mr. Dakermanji, the manager of Cigar Masters, did it himself shortly before the hearing on this motion. Tr. 183.

Based on this evidence, considered in light of the unambiguous Lease language in § 18.3 establishing the duty to maintain the ventilation system, I find that, from the execution of the Lease through the end of 2010, compliance required, at a minimum, changing the prefilters at least every ten weeks, or five to six times a year, and changing the charcoal filters at least every four months, or three times a year. Beginning at the latest in January 2011 (when Cigar Masters acknowledged the need to change the filters monthly) and continuing to the present, I find that compliance with Cigar Masters' duty to maintain the ventilation system required, at a minimum, changing the prefilters at least once a month, or twelve times a year, and changing the charcoal

filters at least every six weeks, or eight to nine times a year. Further, as confirmed by the Cigar Masters' January 13, 2011, email (Ex. Z), I find that the Lease required Cigar Masters proactively to adopt and maintain the regular schedule and not to sit back and wait for complaints. Finally, I find that the evidence conclusively establishes that, since 2010, Cigar Masters has continuously been in breach of this duty to maintain the ventilation system pursuant to § 18.3 and that this breach has caused tobacco smoke and odors to build up in the air circulating inside Cigar Masters, as well as in the air exhausted by Cigar Masters into the street.

**F.** **Negative Air Pressure and Building Configuration – Other Causes of Smoke Infiltration**

As time passed, Omni and Cigar Masters came to understand that the failure of Cigar Masters to comply with its duty to maintain the ventilation system by timely changes of the filters was not the only cause of the smoke and odors escaping from Cigar Masters' premises. In February 2011, Cigar Masters paid for an engineering study (Ex. 2), which concluded that Fleming's was under what Phalanx's representative described as "severe negative pressure," causing it to pull air from Cigar Masters into its dining room and other areas through openings, gaps and cracks. Ex. D2 at 16; Ex. 2 at 8. This study also concluded that that negative air pressure in the Hotel, and particularly air pressure changes caused by the movement of elevators in the east towers, created a "stack effect," sucking air from Cigar Masters into the common areas, hallways, and the elevator shaft, which carried it up to the Hotel rooms and condominium units above. Tr. 53-54; Ex. 2 at 8. To minimize the effect of this problem, Cigar Masters paid to have cracks and gaps on its side of the interior walls sealed. Tr. 104, 184. However, it could not compel Omni, Fleming's or the Residence to do the same for the other side of these walls. Tr. 105-06. Nor was Omni able to persuade Fleming's to alter the air pressure in its dining room.

Exs. 6-7; Tr. 69-72.  I find that this cause (which I will refer to as the "air pressure imbalance")

of escaping smoke and odor was beyond the control of Cigar Masters to ameliorate.

Also as time passed, the parties came to understand that the location of the Cigar Masters

exhaust panel was problematic because the air spewing out of the panel was being pulled back

into the parking garage either through the garage door or through the louvers above the exhaust

panel.  Ex. D2 at 19-20.  In addition, when downtown Providence is windy, especially in the

winter or during a snow storm, the air exhausted outside by Cigar Masters is swept around the

corner into the entrances to Fleming's and the Residences.  Tr. 26; Ex. D2 at 19.  Finally,

witnesses testified to smelling tobacco smoke and seeing smoke on the public sidewalk below

the Cigar Masters exhaust panel.  E.g., Ex. D2 at 17-18; Tr. 45; Tr. 79.  As Mr. Potter described

it, "because of the way the, the building is constructed of allowing outside air to come in that the

chimney effect or whatever term you want to put to it for the east tower, that is pulling in all

outside air but it's also pulling in the, the smoke odor vented from, from Cigar Masters."  Tr. 25.

Like the air pressure imbalance, I find that the phenomena that caused Cigar Masters' exhaust to

be pulled back into the building (which I refer to as the "building configuration issues") were

also beyond the control of Cigar Masters.

Several witnesses testified about the relationship between, on one hand, Cigar Masters'

abjuration of its § 18.3 duty to maintain its ventilation system and, on the other, the smoke

infiltration caused by air pressure imbalance and the building configuration issues, which Cigar

Masters could not control.  For example, the Phalanx representative explained that, because of

the building configuration issues and the air pressure imbalance, changing the filters regularly

would minimize, but would not eliminate the tobacco smoke odor escaping from Cigar Masters.

Ex. D2 at 27-30.  Mr. Potter's testimony is consistent: "if the air within Cigar Masters was being

properly treated then the amount of smoke whether it's going to the outside, the outdoors or into the building would be far less." Tr. 54-55. As he explained:

> [W]hen the filters were being changed, that you could tell. The complaints for the most part stopped. We could also tell when it was time for a filter change, not just by our own observations but by residents and visitors to the building. Over the past year [since filter changes virtually stopped], the complaints have been endless.

Tr. 47. Mr. Sweeney concurred: "we were noticing a difference when the filters were changed that we weren't smelling smoke as consistently as we had been." Tr. 113. He opined that the problem with smoke and odor begins with Cigar Masters' consistent failure to change their filters and is exacerbated by the negative air pressure in Fleming's, the movement of elevators in the east tower and the impact of wind carrying Cigar Masters' exhaust back into the building, which he described as "a design flaw when that building was built and at no time should we ever have leased it to a smoke bar." Ex. 16; see Tr. 109-11.

Based on this evidence, I find that Cigar Masters' breach of its § 18.3 duty to maintain the ventilation system seriously exacerbated the amount of tobacco smoke and odor contaminating the air that escaped from its premises due to air pressure imbalance and the configuration of the building. Further, I find that it would be speculation to draw any conclusions about the level of harm attributable to air pressure imbalance and the configuration of the building, above and beyond the harm caused by Cigar Masters' breach. That is, the evidence does not establish that, if Cigar Masters' air had been properly filtered by the ventilation system in accordance with the unambiguous terms of the Lease, the infiltration of such filtered air due to air pressure imbalance and building configuration issues would have caused significant or irreparable injury. Rather, the evidence establishes that proper maintenance of the ventilation system would significantly minimize the adverse impact of Cigar Masters'

smoke on Omni and its tenants; as Mr. Potter testified, "what we found to work was if the, the ventilation system was maintained."  Tr. 29.

**G.      History of the Relationship of the Parties**

Because the events that unfolded over the course of the dealings first between the Procaccianti Group and Cigar Masters, and later between Omni and Cigar Masters, affect the equities pertinent to this motion, I pause briefly to recast the facts in chronological order.

    1.      The Procaccianti Group as Landlord – 2008 to 2012

After Allen Potter assumed responsibility for the Procaccianti Group's relationship with Cigar Masters in late 2008, he met with Cigar Masters; together they concluded that "shortening up on the timespan with filter changes aided in that effort a lot."  Tr. 18.  During this early period, Cigar Masters was proactively changing the filters.  Tr. 31.  However, over time, the filters were changed only if Mr. Potter complained – "over time [it] became more and more of an effort."  Tr. 32-33.  Mr. Potter attributed some of the difficulty to the fact that, at first, Cigar Masters' management had been directly involved with the Providence location and its employees were very responsive but, later, management was not onsite and Cigar Masters' staff was plagued by constant turnover; new personnel knew nothing of the "procedures for maintaining the system."  Tr. 33-35.  In January 2011, when Cigar Masters' co-owner and vice president, Brandon Salomon, directed the manager of the Providence location to procure a "standard work order" to get the filters changed on a regular schedule, "minimally monthly and charcoals every 6 weeks," Ex. Z, his instructions were ignored.  Tr. 32.

    2.      Omni as Landlord – 2013 to Present

In March 23, 2013, Mr. Potter apprised Omni, as the new owner, of the situation from his perspective:

> We typically have been okay as long as they stay on top of changing their filters and the carbon bank on a monthly basis . . . There have been so many management changes at Cigar Masters I have no idea who is in charge now.

Ex. N.  In February 2014, Mr. Potter again summarized the smoke problem for Omni, advising that the east tower's parking garage and elevators make it a "natural chimney" and that the location of Cigar Masters' exhaust panel causes smoke-laden air to be sucked into the parking garage.  Ex. O.  He reiterated that "continued maintenance of the filtration system [is] the only method to be found effective."  Id.

      As Cigar Masters' rate of changing its filters continued to decline, on February 18, 2014, Omni sent a formal notice requesting that Cigar Masters adopt the schedule of regular monthly filter changes, as well as that it repeat the sealing of the seams and gaps.  Exs. D, 8.  This notice included an offer by Omni to have an engineer inspect the premises of Cigar Masters and Fleming's to determine if additional work might "rectify this issue."  Id.  In April 2014, Cigar Masters reported that it was changing the filters, putting in new switches and outlets, and getting the windows caulked.  Ex. 10.  However, its attention to the filter changes was short lived; for the rest of 2014, throughout 2015, and into 2016, Cigar Masters' compliance sunk to a new low of only three filter changes in 2014 and only two in 2015.  Exs. H, Q, R, 11, 12.

      In the spring of 2016, patience ran out.  Omni was persistently receiving negative feedback from Hotel guests on its customer satisfaction survey about the smell of smoke.  Tr. 80.  Then Fleming's sent a Notice of Default to Omni on March 9, 2016, based on Omni's failure to "remedy the noxious odors emanating from the nearby cigar bar."  Exs. I, 13.  Omni responded with its own notice of default sent to Cigar Masters on March 22, 2016; the notice demanded that it immediately establish a protocol for monthly filter changes.  Exs. I, 14.  Omni told Fleming's (but not Cigar Masters) that it planned to bring in an engineer to explore "what other steps, if

any, can be taken to remedy the issue." Ex. 14. In response to the default notice, Cigar Masters brought in Phalanx for one prefilter change on March 25, 2016, and one charcoal filter change on April 8, 2016, but did nothing about setting up a regular maintenance schedule. Ex. G. By mid-May 2016, Fleming's was complaining again, and Omni itself observed that the filters were "filthy"; Cigar Masters did what turned out to be its last filter maintenance for almost a year, changing only the prefilters on May 25, 2016. Exs. 15, G, K; Tr. 132.

On June 14, 2016, Omni sent another formal demand to Cigar Masters – this one required the execution of an amendment to the Lease requiring Cigar Masters to pay for an annual contract for monthly prefilter changes and quarterly charcoal filter changes. Ex. L. Cigar Masters ignored the demand. Tr. 94. Mr. Dakermanji, who had just become Cigar Masters' manager in Providence, explained that Cigar Masters refused because Omni would not guarantee that the Lease amendment would end the dispute: "we'll still be liable for an engineering issue in the building . . . this is not going to solve the issue." Tr. 181. However, Mr. Dakermanji conceded that he did not know that the Lease placed the duty to install and maintain the ventilation system on Cigar Masters; according to him, no one at Cigar Masters knew when the filters were supposed to be changed. Tr. 186-92. He changed the filters himself in March of 2017, the first time it had been done since the spring of 2016. Tr. 182-83.

With no response from Cigar Masters to the demand that it arrange for monthly filter changes, Omni abandoned the plan to hire an engineering firm; instead, it proceeded to terminate the lease. Ex. 17; Tr. 121, 126. On June 29, 2016, it sent "Notice of Termination of Possession," which demanded that all smoking be stopped immediately and that Cigar Masters vacate the premises by July 29, 2016. Ex. M. Cigar Masters did neither. Instead it filed this suit in the Superior Court.

### H. Evidence of Harms

The testing done by Omni's expert, Mr. Ecord, established that nicotine was building up inside the Fleming's dining room, in one of the common hallways of the Residences and on the exterior of the Cigar Masters' exhaust panel. Tr. 161. The quantity found permitted him credibly to conclude, and I so find, that Fleming's staff and guests, the Residences' staff and occupants, the Hotel staff and guests, and pedestrians on West Exchange Street are all being exposed to secondhand smoke generated by Cigar Masters' operations, as well as that this exposure is at a level that poses a threat to public health. Tr. Tr. 160-65. In addition, both Omni and the Residences presented credible evidence of lost business and adverse impact on reputation, including guests, owners and tenants unhappy with being exposed tobacco smoke and odor while staying at, living in or visiting a facility with a reputation of being smoke-free. E.g., Tr. 45. Moreover, Omni established that it is facing the potentially serious, indeed catastrophic, consequence of having no restaurant for its guests, if Fleming's carries out its threat to break the lease.

On Cigar Masters' side, Mr. Dakermanji credibly confirmed that the inability to allow smoking would destroy the core of Cigar Masters' business and amount to a death-knell – "[w]e will never be able to stay in business." Tr. 185-86.

## II. APPLICABLE LAW AND ANALYSIS

### A. Standard of Review for Preliminary Injunctive Relief

When considering a request for interim injunctive relief, courts are guided by the traditional equity doctrine that preliminary injunctive relief is an extraordinary and drastic remedy that is never awarded as of right. Voice of the Arab World, Inc. v. MDTV Med News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011). To obtain such relief, the moving party must

demonstrate: (1) a substantial likelihood of success on the merits; (2) a significant risk of irreparable harm if the injunction is withheld; (3) a favorable balance of hardships; and (4) a fit (or lack of friction) between the injunction and the public interest. Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008); Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003). The four factors are not weighted equally; "likelihood of success is the main bearing wall of this framework" and of primary importance. W Holding Co., Inc. v. AIG Ins. Co.-Puerto Rico, 748 F.3d 377, 383 (1st Cir. 2014); Flores v. Wall, C.A. No. 11-69 M, 2012 WL 4471103, at *3 (D.R.I. Sept. 5, 2012); see Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998) (plaintiff's likelihood of success is "the touchstone of the preliminary injunction inquiry."). "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006). Irreparable harm is measured on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Braintree Labs., Inc. v. Citigroup Global Markets Inc., 622 F.3d 36, 42-43 (1st Cir. 2010). Irreparable injury is one that is not resolved through legal remedies.[4] Voice of the Arab World, 645 F.3d at 32.

---

[4] One of Cigar Masters' arguments against the propriety of equitable intervention may quickly be resolved. Invoking Davis v. Girard, 38 A.2d 774 (R.I. 1944), Cigar Masters relies on the hoary principle that an injunction should not issue if an adequate legal remedy is available. Davis holds that an action to establish title may not proceed if the injury is "remediable by an action of trespass and ejectment." Id. at 776-77. However, Davis was decided before the Rhode Island's merger of law and equity. With the merger of law and equity, it is clear that a tenant engaged in destructive conduct causing irreparable harm may be enjoined on the landlord's motion for an interim injunction while the eviction is proceeding. Bech v. Cuevas, 404 Mass. 249, 254, 534 N.E.2d 1163, 1167 (1989) (landlord may protect property from damage by tenant with preliminary injunction during significant delay until judgment of eviction enters).

Generally, the purpose of the preliminary injunction "is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 620 (1st Cir.1995). However, a motion for injunction can also seek to change the status quo and demand that a party take affirmative action – this is known as a "mandatory injunction." See Textron Fin. Corp. v. Freeman, C.A. No. 09–087S, 2010 WL 5778756, at *2 (D.R.I. Oct. 28, 2010); see W Holding Co., 748 F.3d at 383 ("mandatory preliminary injunction . . . 'disturb[s], rather than preserve[s], the status quo'"). When the relief sought is a mandatory injunction, the court should exercise even a further degree of caution. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 66 F. Supp. 2d 317, 327 (D.R.I. 1999) (plaintiff's request for a mandatory injunction held to a standard of "heightened scrutiny"); see Flores, 2012 WL 4471103, at *7. A mandatory injunction should not issue unless the facts and the law clearly favor the moving party. Robinson v. Wall, C.A. No. 09-277S, 2013 WL 4039027, at *2 (D.R.I. Aug. 7, 2013).

To illustrate, if a party seeks an interim order to force the closing of a business that has been operating for several years, that is a change to, rather than the preservation of, the status quo; in such a case, a greater showing is required of the moving party. Gov't Ctr. Camera, Inc. v. United States, Civ. A. No. 87-2208-S, 1987 WL 28337, at *1 (D. Mass. Nov. 5, 1987). Further, a multi-year delay undercuts the sense of urgency that justifies a preliminary injunction; it suggests that there was no irreparable injury. Id. at *2. Nevertheless, if the facts and law align in favor of mandatory relief, the court should not hesitate to order a party affirmatively to comply with its contractual obligations. W Holding Co., 748 F.3d at 386.

**B.     Likelihood of Success on the Merits**

1.     Breach of Contract and Implied Covenant of Good Faith and Fair
       Dealing

Under Rhode Island law, a plaintiff who claims breach of contract must prove that "(1) an

agreement existed between the parties, (2) the defendant breached the agreement, and (3) the

breach caused (4) damages to the plaintiff."  Barkan v. Dunkin' Donuts, Inc., 627 F.3d 34, 39

(1st Cir. 2010) (citing Petrarca v. Fid. & Cas. Ins. Co., 884 A.2d 406, 410 (R.I. 2005)).

Relatedly, every contract in Rhode Island includes "an implied covenant of good faith and fair

dealing between parties."  Hord Corp. v. Polymer Research Corp. of Am., 275 F. Supp. 2d 229,

237 (D.R.I. 2003) (citing Dovenmuehle Mortg., Inc. v. Antonelli, 790 A.2d 1113, 1115 (R.I.

2002)).  The covenant is regarded as a promise by each contracting party to act in a manner

consistent with the purposes of the contract.  Ross-Simons of Warwick, 66 F. Supp. 2d at 330.

In a case sounding in contract, the Court's first task is to determine whether the contract is clear

and unambiguous; if it is, judicial construction ends and the Court will enforce the contract as

written, giving the language in the contract its "plain, ordinary and usual meaning."  Hord Corp.,

275 F. Supp. 2d at 235 (quoting Amica Mutual Ins. Co. v. Streicker, 583 A.2d 550, 552 (R.I.

1990)).  I find no material contractual ambiguity in the Lease in that the pivotal provisions, §§

18.3 and 18.4, are clear and succinct.

The starting point of the analysis is § 18.3's opening sentence, which imposes on Cigar

Masters the duty to "maintain throughout the Term a ventilation system designed to remove, to

the extent technologically feasible, smoke and related odors from the interior of the Premises and

from any exhaust to the outside of the Premises and into any Common Areas."  I have already

found that Cigar Masters breached this duty.  This duty is reinforced by §§ 18.4 and 6.2, in

which Cigar Masters promises to abide by Rhode Island's laws and regulations related to tobacco

sale and use in a public place.  As pertinent here, Rhode Island law mandates that:

> Any smoking bar, as defined herein, is required to provide a proper ventilation
> system that will prevent the migration of smoke into the street.

R.I. Gen. Laws § 23-20.10-2(15)(c). Also applicable is R.I. Admin. Code 31-1-17:2.2(b),

which requires ventilation to prevent migration of smoke into "areas where smoking is

prohibited," including areas available to and used by the general public in hotels, bars,

elevators, lobbies, hallways and other common areas in condominiums, and restaurants.

R.I. Gen. Laws § 23-20-10-3. I also find that Cigar Masters breached its duty to comply

with Rhode Island law. I further find that these duties are not contingent on or subject to

any obligation, duty or predicate action required to be performed by the landlord; rather,

they are absolute, unequivocal and clear. However, they are cabined by the phrase "to

the extent technologically feasible" – this limitation makes clear that § 18.3 of the Lease

does not require Cigar Masters to do what is impossible. Therefore, Cigar Masters'

defense that it lacked control over the air pressure imbalance or building configuration

issues does not apply. If Cigar Masters had properly maintained an appropriately

designed ventilation system, but complete removal of tobacco residue from its interior

premises or its exhaust was technologically infeasible, to that extent, I find that Cigar

Masters would not be in breach.

Focusing on the last sentence of § 18.3,[5] which addresses how Cigar Masters must

respond to complaints from Omni, its tenants or anyone else about smoke and odors, Cigar

Masters argues that it somehow imposes the affirmative duty on Omni, as landlord, to perform

the analysis necessary (by hiring engineers and other experts) to determine what improvements

---

[5] The sentence states: "In the event Tenant receives any complaints from any party, including without limitation from Landlord, or if Landlord should receive any such complaints regarding smoke and/or odors as a result of Tenant's Use, Tenant shall promptly and without delay make whatever improvement that may be needed, again with landlord's prior approval, to minimize if not eliminate such smoke and odors." Ex. A § 18.3.

may be necessary "to minimize if not eliminate such smoke and odors." Since Omni advised both Cigar Masters and Fleming's that it was considering bringing in an engineer to do a study of the smoke problem, but never did, Cigar Masters argues that this is a prior breach, which voided Cigar Masters' duty to do anything, including to perform even the basic maintenance of its ventilation system. Effectively, Cigar Masters blames Omni's failure to hire an engineer to identify necessary modifications for its own failure to comply with its duty under § 18.3.

Cigar Masters extracts this improbable interpretation from the phrase "with the landlord's prior approval." Fairly read, I find that this sentence means only that a complaint may trigger Cigar Masters' duty (not Omni's duty) to go beyond the maintenance of the ventilation system required in the first sentence of § 18.3 by promptly making "whatever improvements that may be needed" to further reduce or eliminate smoke and odor. The sentence merely gives Omni the right to approve any such "improvement," since it may involve changes to the building. This approval right is consistent with the right of the landlord to approve the tenant's alterations to the premises reflected in § 5.3. As with the other duties imposed by § 18.3, there is nothing ambiguous about Cigar Masters' obligation to be responsive to complaints. Hord Corp., 275 F. Supp. 2d at 235. I do not find that the Lease imposed on Omni an affirmative duty to perform engineering studies or to solve the puzzle of what are the "improvements that may be needed" to further minimize smoke and odor; I further find that Omni's statements that it was planning to bring in an engineer,[6] but never did, did not alter or cause a waiver of the duties imposed on

---

[6] Cigar Masters' attempt to paint this as Omni reneging on a contractual duty rings hollow when Omni's conduct is examined in context. As the evidence established, Omni coupled the statement of intent to bring in an engineer with its demand that Cigar Masters comply with its duty properly to maintain the ventilation system. Ex.D. When Cigar Masters ignored the demand and continued to ignore its § 18.3 obligation, Omni sent the default notice and (understandably) did not bother to hire an engineer.

Cigar Masters by the Lease.  <u>See</u> Ex. A § 19.7 (no waiver of rights or modification of Lease

results from indulgence by landlord or any, custom or practice of parties).

In a further attempt to avoid the consequences of its failure to maintain the ventilation

system, Cigar Masters pounces on what I find is an obvious typographical error in § 18.2(b) of

the Lease.[7]  I interpret this provision as establishing Omni's duty to prevent "objectionable

odors" generated in other areas of the Hotel, Fleming's or the Residences (such as the parking

garage) from emanating or being dispelled beyond the premises where they are generated.  Ex. A

§ 18.2(b).  The ambiguity arises because, instead of the term "premises," which is used in the

preceding subsection, the scrivener of 18.2 (b), used the term "Premises," with a capital "P."  <u>Id.</u>

In the preamble to the Lease, "Premises" is a defined term that refers to Cigar Masters' space,

Ex. A at 1, while the non-defined term "premises" refers to other areas of the building.  Cigar

Masters argues that this should be read literally to mean that Omni and its other tenants each

assumed the obligation to ensure that Cigar Masters' "objectionable odors" remain inside Cigar

Masters' premises, rather than to ensure that their own "objectionable odors" remain in their own

premises; on this illogical foundation, Cigar Masters asks the Court to find that Omni owed

Cigar Masters the duty to perform alterations and renovations to the building as necessary to

prevent Cigar Masters' smoke from escaping, including to solve the air pressure imbalance.

I find that the use of "Premises" instead of "premises" is plainly a typographical error.[8]

Read in context, the purpose of § 18.2 is to protect Cigar Masters from the sounds, smells,

---

[7] This provision states: "Landlord covenants that in connection with the operation of the Hotel, Landlord and each other tenant of the Hotel shall: . . . [n]ot cause or permit objectionable odors to emanate or be dispelled beyond its Premises."  Ex. A § 18.2(b).

[8] This interpretation is confirmed by the possessive pronoun "its," which precedes "Premises" and defines whose premises are intended.  As § 18.2 is drafted, the antecedent of "its" clearly is "the Hotel, Landlord and each other tenant of the Hotel."  Ex. A § 18.2(b).  Thus, "its" makes plain that the "Premises" that the pronoun modifies in § 18.2(b) is the space controlled by the Hotel and by Omni and its other tenants, not the space occupied by Cigar Masters.

delivery vehicles, advertising, merchandising and unauthorized uses (for example, as a discotheque or for a public assembly) that might occur in connection with the business of the Hotel, the Residences and Fleming's. Consistently, it is clear that the "Premises" referred to in § 18.2(b) are to the other premises (that is, not Cigar Masters' premises) where such activities might occur. Cigar Masters' interpretation of § 18.2(b) also fails because it would render void the critical duties imposed on Cigar Masters in §§ 18.3 and 18.4 by reallocating the obligation to prevent smoke and odor from leaking out of Cigar Masters' premises to Omni. This falls well outside of the realm of common sense, when read in context with the entirety of the Lease. See A.J. Amer Agency, Inc. v. Astonish Results, LLC, C.A. No. 12-351S, 2014 WL 3496964, at *26-27 (D.R.I. July 11, 2014) (interpretation based on "obvious scrivener's error" rejected as contrary to common sense, particularly when clause is read in context with related provision).

The last question for consideration is whether Omni or the Procaccianti Group somehow waived the right of the landlord to insist on compliance with the duty to maintain the ventilation system by their undertaking, year after year, of asking, begging and cajoling Cigar Masters to change its filters. Section 19.7 of the Lease provides the answer:

> The waiver or indulgence of any default . . . shall not be construed as an agreement to modify the terms of this Lease nor to operate as a waiver of any subsequent default, and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of . . . Landlord's right to demand exact compliance with such terms.

Ex. A § 19.7. I find Omni's "indulgence" of Cigar Masters' perennial default of its § 18.3 obligations did not result in a waiver of any of Omni's contractual rights arising from the breach.

To summarize, I find that Omni is overwhelmingly likely to succeed on the merits of its claim that Cigar Masters completely failed in its duty to maintain its ventilation system as required by § 18.3 of the Lease. I further find that Omni is also likely to succeed on the merits of

its claim that Cigar Masters failed in its duty set out in §§ 18.3 and 6.2 of the Lease to comply with R.I. Gen. Laws § 23-20.10-2(15)(c) and R.I. Admin. Code 31-1-17:2.2(b), both of which obligated Cigar Masters to maintain a "proper ventilation system that will prevent the migration of smoke" into the street or into the public areas, such as the Hotel common areas and Fleming's dining room.  Finally, I find that Omni will likely succeed on the merits of its claim that Cigar Masters breached the covenant of good faith and fair dealing.  A central purpose of the Lease is to ensure that Cigar Masters would assume the responsibility for the tobacco smoke and odor its operations would generate, as well as that the smoking of tobacco would not interfere with the business of Omni's other tenants, such as Fleming's and the Residences.  Cigar Masters' blatant disregard of this responsibility has resulted in an interference with the operations of Fleming's serious enough to induce it to threaten to break its lease, an interference with the operation of the Residences serious enough to cause it to lose prospective owners and tenants, and an interference with the Hotel that has resulted in persistent customer complaints, thereby depriving Omni of the benefit of the parties' bargain.

2.     Nuisance and Trespass

Omni's alternative foundation for interim relief rests on its tort claims based on common law nuisance and trespass, arising from the infiltration of Cigar Masters' smoke, odors and noxious chemicals (nicotine) into the hallways of the Hotel and the Residences, into the dining room of Fleming's and into the area above the public sidewalk that serves its building.

Actionable nuisances fall into two classes, public and private.  Citizens for Pres. of Waterman Lake v. Davis, 420 A.2d 53, 59-60 (R.I. 1980).  A private nuisance requires proof of an injury caused by a material interference with the use and the reasonable use and enjoyment of one's property.  Iafrate v. Ramsden, 96 R.I. 216, 221, 190 A.2d 473, 476 (1963).  "A public

nuisance is an unreasonable interference with a right common to the general public: it is behavior that unreasonably interferes with the health, safety, peace, comfort or convenience of the general community." Citizens for Pres. of Waterman Lake, 420 A.2d at 59. The burden of proving a nuisance is upon the party alleging it, who must demonstrate the existence of the nuisance and the injury it has caused. Id. Nuisance does not require proof of negligence; rather, its focus is on the reasonableness of the interference with a neighbor's ability to use its property or with the health or safety of the general public. Wood v. Picillo, 443 A.2d 1244, 1248-49 (R.I. 1982) (dumping operation that injured neighbors and general public by exposure to toxic chemicals constitutes both public and private nuisance); see Pine v. Vinagro, C.A. No. PC-95-4928, 1996 WL 937004, at *23 (R.I. Super. Nov. 4, 1996) (stockpile that emitted smoke, odors and airborne toxins into surrounding neighborhoods constitutes public nuisance).

Liability for nuisance is imposed only in those cases in which the harm or risk is greater than what is appropriate under the circumstances. Citizens for Pres. of Waterman Lake, 420 A.2d at 59. To be actionable, the interference must be substantial and the injury must be "permanent and repeated," an "inconvenience interfering with the ordinary physical comfort of human existence." Tuttle v. Church, 53 F. 422, 425-26 (D.R.I. 1892) (prayer for interim injunction denied because evidence established improved manufacturing methods had reduced frequency of odor to "rare"). The operation of a business that creates "noisome smells, or noxious vapors . . . which affect injuriously property in the vicinity or render the occupation thereof inconvenient and uncomfortable, is a nuisance" that may be judicially enjoined. Commerce Oil Ref. Corp. v. Miner, 281 F.2d 465, 473-74 (1st Cir. 1960). However, if the smells have become infrequent, so that "little or no noxious odors or smoke have been noticed in the surrounding neighborhood in the past two years," the potential nuisance is not sufficient to

support interim injunctive relief.  Tuttle, 53 F. at 427.  Common law trespass is similar; "for trespass to property, one must enter the land in the possession of another or cause something to do so, remain on the land, or fail to remove from the land a thing that he is under a duty to remove."  Mesolella v. City of Providence, 508 A.2d 661, 668 n.8 (R.I. 1996) (quoting Restatement (Second) Torts § 158 at 277 (1965)).

Omni argues that Cigar Masters' blatant disregard of its duty to maintain the ventilation system amounts to nuisance *per se*.  Nuisance *per se* is an amorphous concept not well defined in the law, that is used to condemn activities that not only interfere with the use of property but also violate state or local law.  For example, in Friends of Sakonnet v. Dutra, 738 F. Supp. 623, 636 (D.R.I. 1990), this Court held that the illegal dumping of sewage into the state rivers is a nuisance *per se*.  Without using the term, the Rhode Island Supreme Court appeared to recognize the concept in State v. Lead Indus. Ass'n, Inc., 951 A.2d 428, 447 (R.I. 2008), when it held that "[a]ctivities carried out in violation of state laws or local ordinances generally have been considered unreasonable if they interfere with a public right."

I find that Omni has proven that it will succeed on the merits of its tort-based claims.  By its deliberate refusal to change its filters for months, causing its ventilation system to fail, Cigar Masters has unreasonably interfered with the rights of the private parties (Omni and its tenants) to enjoy the use of their property and with the right of the public to be free from the negative health effects of secondhand smoke.  Further, Cigar Masters' abnegation of its duty to change the filters has caused smoke and nicotine, in observable and measurable amounts, to enter Fleming's public dining area, the Residences' condominium common areas, the Hotel's hallways and elevators and the air above the public sidewalk.  The presence of such smoke not only constitutes a trespass, but also flaunts the statute and the regulation that authorize Cigar Masters' operation,

which specify that smoking is permitted in a cigar bar only if the proprietor "provide[s] a proper ventilation system that will prevent the migration of smoke into the street," R.I. Gen. Laws § 23-20.10(15)(c), or into "areas where smoking is prohibited under the provisions of the Act or these Regulations." R.I. Admin. Code 31-1-17:2.2(b). Thus, this is a circumstance where the unreasonable interference and infringement with private and public rights is also a "violation of state laws or local ordinances." Lead Indus. Ass'n, 951 A.2d at 447.

Cigar Masters tries to counter Omni's evidence by pointing to the cases holding that an essential element of these torts is that the unreasonable interference or infringement must have been caused by an actor with control over the instrumentality alleged to have created the nuisance or the trespass. Id. at 452-54; see Dunellen, LLC v. Power Test Realty Co. P'ship, C.A. No. 09-211-JNL, 2013 WL 164486, at *18 (D.R.I. Jan. 15, 2013) ("[w]here the tenant does not have sufficient control to make the necessary repairs, the tenant should not be held liable"). Nevertheless, if a defendant controls the operation causing the noxious smells and the smoke could be better contained by the use of an approved design, the defendant's failure to use that design renders his operation a nuisance and justifies the issuance of an interim order to mandate the use of the approved design. Vinagro, 1996 WL 937004, at *22-24. Notably, in Vinagro, the court found that use of the approved design might not eliminate all smoke and odor, but held that, if the approved design had been used, the operation would not have been found to be a public nuisance even if some noxious smoke continued to escape. Id.

Cigar Masters argues that it cannot guarantee that smoke from its operations will not be pulled into Fleming's and/or the Residences because of the air pressure imbalance and building configuration issues over which it completely lacks control. This blame-shifting argument requires the Court to overlook the reality that the smoke is generated by Cigar Masters, the

ventilation system is under Cigar Masters' control and it is Cigar Masters that is obliged by law and the Lease to maintain the ventilation system, but persistently has failed to do. See Dunellen, 2013 WL 164486, *18 (if tenant "contributed to the nuisance" by its operation, it is liable) (citing Knauss v. Brua, 107 Pa. 85 (1884)). Vinagro illustrates the point: whether or not the design approved to abate the smoke would be totally effective is beside the point. Rather, Vinagro focused on the defendant's failure to use the approved design at all; it held that residual smoke escaping once the defendant was in compliance with the approved design would not amount to a nuisance. 1996 WL 937004, at *23.

I reject Cigar Masters' defense based on its lack of control over the negative air pressure and building configuration problems – this defense fails because it ignores Cigar Masters' complete control over its own operations and its ventilation system. If Cigar Masters had complied with its acknowledged duty to change its filters, it is possible, based on the evidence presented, that the escaping air caused by air pressure imbalance and the building configuration would have been sufficiently cleaned of noxious smoke and odors as to create only a *de minimis* interference or injury, if any. And if Cigar Masters was in full compliance with its side of the bargain, so that the only causes of tobacco-laden smoke infiltration were the air pressure imbalance or the building configuration, the defense of lack of control would require serious consideration. However, that is not the case. As in Vinagro, Cigar Masters ignored its obligation to perform basic maintenance on its ventilation system. Therefore, I find that Omni is likely to succeed on the merits of its claims of nuisance and trespass.

### C. Irreparable Harm

In order to obtain a preliminary injunction, Omni must demonstrate "the potential for irreparable harm if the injunction is denied." Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,

102 F.3d 12, 15 (1st Cir. 1996). Threats to public health and safety constitute irreparable harm that will support an injunction. See Gianfrancesco v. A.R. Bilodeau, Inc., 112 A.3d 703, 710-11 (R.I. 2015); Reitsma v. Recchia, C.A. No. 00-4111, 2000 WL 1781960, at *5 (R.I. Super. Nov. 20, 2000). For example, in Gianfrancesco, despite the passage of fourteen years before an injunction was requested, the court enjoined a defendant from driving its tractor-trailer trucks through a restaurant's parking lot because they posed a "safety hazard" to restaurant customers. 112 A.3d at 710-11. Similarly, in Reitsma, the trial court preliminarily enjoined the operation of a solid waste disposal facility based on the emanation of "rotten egg" odors, which were adversely affecting the health of nearby residents. 2000 WL 1781960, at *6.

Based on the evidence, I find that Omni has sustained its burden of proving irreparable harm if Cigar Masters is not enjoined despite the delay of almost six years during which Omni, and the Procaccianti Group before it, tried to nag, cajole and threaten Cigar Masters to comply with its duty to maintain the ventilation system. Once Fleming's gave its formal notice of default based on the level of tobacco smoke invading its dining room, Omni acted promptly, shifting from its fruitless effort to get Cigar Masters to comply to its current effort to get Cigar Masters out of the building. In addition to the significant loss to Omni if Fleming's were to act on its threat, Omni has also proven irreparable harm resulting from the adverse impact on its business caused by the material amounts of smoke, odor and nicotine collecting in its hallways, in Fleming's dining room and in the area of the public sidewalk, affecting both staff and members of the public who frequent Fleming's, the Hotel and the Residences. See R.I. Gen. Laws §§ 23-20.10-3 & 23-20.10-4. Relatedly, I find that the threat of secondhand smoke to the health and safety of Omni's tenants, employees, patrons and guests constitutes irreparable harm that supports the issuance of an injunction.

### D.    Public Interest

Omni argues that the requested preliminary injunction will serve the public interest by ending the escape of secondhand tobacco smoke and toxic nicotine in public spaces that the General Assembly has specifically designated as smoke-free.  R.I. Gen. Laws §§ 23-20.9-2; 23-20.10-3; 23-20.10-4.  Omni's expert, Mr. Ecord, provided the testimonial foundation for the settled fact, which Cigar Masters has not attempted to controvert, that no amount of secondhand tobacco smoke is safe.  Based on this evidence, I find that Cigar Masters' lackadaisical approach to its duty to maintain its ventilation system has caused such exposure to be inflicted on the public.  Tr. 160; see United States v. Philip Morris USA, Inc., 566 F.3d 1095, 1106 (D.C. Cir. 2009) ("secondhand smoke causes lung cancer"); Brashear v. Simms, 138 F. Supp. 2d 693, 694 (D. Md. 2001) (harmful effects of secondhand smoke are "well-known").  Accordingly, I find that the interest of the public in avoiding exposure to secondhand tobacco smoke tips the scale in favor of the issuance of an injunction to end such exposure while this case progresses towards final judgment.  Taverns for Tots, Inc. v. City of Toledo, 341 F. Supp. 2d 844, 946 (N.D. Ohio 2004) (public would be irreparably harmed by effects of tobacco smoke if smoking at restaurants and bars not enjoined).

### E.    Balancing of Harms

With every other factor tipping in favor of an interim injunction, I turn last to the examination of the balance of the hardships.  Based on the testimony of Mr. Dakermanji, Cigar Masters' manager, I am satisfied that the requested relief would be its death-knell.  I find unpersuasive Omni's argument that Cigar Masters could survive by providing humidors for cigar aficionados (who would have to go elsewhere to smoke them) and could shift the focus of its business to the sale of alcohol or light food.  From R.I. Gen. Laws § 23-20.10-2(15)(a), which

requires Cigar Masters to be "primarily devoted to the serving of tobacco products for consumption on the premise," to its name, its clientele and its customers, in short everything about it, Cigar Masters' business rests on its ability to provide smokers with a hospitable venue to use tobacco-based products. The elimination of smoking would eviscerate the very essence of this business model. Yet on the other side of the scale is the significant impact of Cigar Masters' unfiltered tobacco smoke on Omni, as well as on the innocent public whose exposure could lead to adverse health consequences.

Based on the foregoing, I find that this balance-of-harms factor is in equipoise, favoring neither party because both will suffer substantial, though very different harms. Nevertheless, it poses an equitable reason for the Court to be reluctant to rush to issue the absolute ban on all smoking, as Omni requests, if a more moderate option adequately addresses the harm.

## III.    RECOMMENDED INJUNCTION

Mindful of the harms on both sides of the scale, and because the basis for the finding that Omni will succeed on the merits of its claims is focused on Cigar Masters' failure even to try to maintain its ventilation system (never mind to explore other devices or methods that it could adopt to comply with its duty to "minimize if not eliminate" smoke and odors), my recommendation regarding the interim remedy focuses in the first instance on an injunction that mandates Cigar Masters' compliance with that obligation. That is, I recommend that the Court order Cigar Masters to:

(1)    Hire immediately a competent engineering firm (preapproved by Omni) at Cigar Masters' expense;

(2)    Cause the engineering firm, also at Cigar Masters' expense, immediately to implement the filter change protocol set out in Exhibit Z and to continue to change the filters on that schedule (or more frequently) for as long as the Order remains in effect; and

(3)     Cause the engineering firm, within a reasonable period of time (not to exceed thirty days), at Cigar Masters' expense, to examine the existing ventilation system and to make recommendations regarding what other maintenance or changes to the ventilation system or to the premises within Cigar Masters' control are reasonably necessary to bring Cigar Masters into compliance with the Lease and Rhode Island law.

The engineering firm shall provide timely notice to Omni of the work it performs and of the recommendations it makes for additional maintenance or changes to the ventilation system or Cigar Masters' premises, including the degree to which Cigar Masters complies with the recommendations. To be clear, I am not recommending that Cigar Masters' implement every recommendation of the engineering firm. The Court is mindful that Cigar Masters' contractual obligation is limited to the removal of smoke and odors from the air in its premises and from its exhaust "to the extent technologically feasible," and to making improvements "to <u>minimize</u> if not eliminate such smoke and odors." Ex. A § 18.3 (emphasis supplied). Consistent with this Lease language, the Court is not requiring Cigar Masters to achieve total elimination, which may be impossible unless and until the negative air pressure and building configuration issues are addressed by Omni. However, if the engineer recommends an improvement and Cigar Masters declines to implement it, Omni may return to the Court for further relief.

If Cigar Masters fails or refuses to perform any of the three requirements that I am recommending, within five days of notice by Omni of such failure, Omni may return to the Court. Immediately upon the filing by Omni of competent proof evidencing such failure or refusal, I recommend that the Court enter the requested preliminary injunction, enjoining Cigar Masters from permitting any smoking or other use of tobacco products on its premises.

## IV.   CONCLUSION

Based on the foregoing, I recommend that the Court grant the motion for preliminary injunction (ECF No. 23) to the extent that it enters the preliminary injunction as described above.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
August 18, 2017